Our fourth argument of the morning is in Appeal No. 24-14-61, Moy v. Colvin. Mr. Cade, good morning. Good morning, Your Honors. May it please the Court. My name is Stephen Kidd, representing Plaintiff. Unless there are specific questions or concerns you'd like to direct my attention towards initially, I'll simply summarize the arguments presented in our briefs. The ALJ's decision in the instant case includes reversible error in three broad categories with multiple errors in each category. One, the ALJ's decision violated the requirements of 20 CFR 404-1520C. Two, the ALJ's decision violated the requirements of SSR 96-8P. And three, the ALJ's decision violated the requirements of SSR 16-3P. First, the ALJ improperly rejected the opinions of Plaintiff's longtime treating psychologist, Dr. Kareem, because he used the word moderate in his treatment notes. It's important to note that Dr. Kareem noted that her functional status was moderate, not her symptoms. He opined her symptoms were the most severe PTSD he had ever seen. The record consistently reflects hallucinations, paranoia, delusions, impaired insight, flight of ideas, and persecutory and obsessive thought content. Mr. Cade, can you help me on the fact on that particular point? What, to your knowledge, is there in the record that tells us about the earliest date for these kind of debilitating effects? Because we know what the onset date is. I'm not, that's not what I'm asking you. But the underlying trauma, the originating event, it looks to me like it was in 1992. That's correct, Your Honor. In Bosnia. And then does the record tell us whether Ms. Moy has suffered all of the mental trauma in keeping with what's in the relevant period here, you know, from the early 90s up until 2020? The record is silent on that point because we don't have medical records, you know, between the 90s and 2020 roughly. But there is evidence in the record that she was working at Home Depot. So there was a time period where she was apparently functioning at a better level and there's been some degeneration in her condition. I think that's the best we can point to conclusively in the record. You can't point to anything specific in June of 2020 that led to the emergency room visit? Nothing specific, Your Honor. No inciting or intervening event. Okay. But she had a pretty steady work history. I don't know if we've got the details of the earnings record, but she worked for a number of years. I didn't review the earnings record specifically with preparation for this, but the earnings records are part of the file. But yes, my understanding is that she worked for a period of time before the relevant time period. Can I ask you, the ALJ described Dr. Kareem's treatment as, quote, somewhat infrequent and conservative. In your view, what makes that an unreasonable view of the evidence? I think when someone's going to describe something as somewhat infrequent, maybe they seek medical attention every few months, a couple of times a year, that sort of thing. In the instant case, Ms. Moy was seeking psychological treatment up to four times a month. Dr. Kareem actually prescribed weekly therapy, correct? Yes. It didn't always happen, but that's what he wrote in the notes. Yes, Your Honor. And initially, he saw her for the equivalence of eight sessions in two weeks. Could I ask also about the significance of the, I'll just call them psychotropic, but medications that she was on? What can you tell us about the strength of those and what they indicate about the severity of her condition? Well, I'm not a pharmacist or a doctor, so I would hesitate to go too far. But the medications that we listed in our brief are all psychotropic medications meant for depression and anxiety. Moving on to my next point, the ALJ also incorrectly found the plaintiff was independent in her daily activities. The record reflects she had disturbed sleep due to paranoia and flashbacks. Her husband helped prepare her meals. She was afraid to leave her house alone. She tried to exercise, but she would become scared and hide. She would have crying fits and outbursts while attempting hobbies. She did not drive because of hallucinations of seeing people covered in blood. She needed reminders for her medication. She lost concentration even while watching television. She had limited socialization because she was afraid to be around people. Plaintiff's husband handled all household finances. Mr. Kidd, could I ask you one other thing? There was some debate back and forth about the extent and timing for her medical insurance coverage. Can you give us your perspective on what the evidence shows about when she had health insurance at relevant times? Not specifically. I don't know when she had coverage and when she did not have coverage. I know that at one point, her doctor recommended that she see a psychiatrist for additional medications and she stated that she couldn't afford to see a psychiatrist. At some point, either her coverage ran out or the psychiatrist being recommended she couldn't afford to see. There is support in the record that she couldn't get the level of care that her doctor was recommending. SSR 16-3P places an affirmative duty on the ALJ to consider and address possible reasons to claim it doesn't receive the level of care that the ALJ would have expected why they didn't receive more care or different care. There's a specific note in the record that she said she couldn't see a psychiatrist. There's no consideration and the ALJ certainly didn't address that in his decision. That's a prima facie violation of his affirmative duty under that ruling. Onto my next point. Actually, we'll skip ahead. I think we've covered Dr. Kareem's opinion unless there are other questions on that topic. The ALJ's decision also violated the requirements of SSR 96-8P. The ALJ purportedly relied on Disability Determination Services opinions rendered at earlier stages, but the RFC finding includes several additional limitations without an adequate explanation or evidentiary support, which showed the ALJ's lay opinions were accurate or sufficient to account for her limitations. So one of the things about your argument there that concerns me a little bit is you, in challenging the RFC assessment, you're basically saying that the limitations that were added and identified, they just don't root themselves precisely enough in the medical record. Right. The ALJ's analysis, and I use that term loosely on this point, is really just a series of summary conclusions. Due to her moderate impairments in concentration, persistence, or pace, I find that she can work a production rate pace. I don't know how the ALJ gets from because of this to that. There isn't an analysis in the record that would prove that. To my eye, maybe I'm mistaken, what the ALJ recognized is that there is a claimant here that there is no question is suffering from pretty serious mental distress. That distress, the hallucinate, everything that you've talked about, may well be quite limiting. As a result, the ALJ added the additional limitations. I mean, that much seems clear from the analysis. Given the standard of review, just a minimal articulation requirement, where do you believe the error lies in that? Sure. If an ALJ is not going to rely on a medical opinion, which doesn't appear to be the case here, but the ALJ can rely on the substantial evidence, should rely on the substantial evidence, if the evidence is going to demonstrate a particular limit, say due to her fear of leaving her house once a month in her medical records that says, I couldn't leave my house on Tuesday, I couldn't leave my house on Wednesday, I couldn't leave my house on Thursday, and that goes on over a period of time, the ALJ would be able to point to that evidence, cite that evidence, and say she would be absent no more than once per month because that's the record, right? In the ALJ's analysis in the instant case, he's not pointing to any particular evidence that shows that his findings are more accurate than every medical professional's in the record. Okay. I understand. You want to save that minute for rebuttal or? I will. Thank you so much, Your Honor. Thank you. Yeah, you're quite welcome. Okay. Let's hear from the Commissioner's Counsel. May it please the Court? Stephen Buddy on behalf of the Acting Commissioner. The substantial evidence... The once and future. I'm sorry? The once and future Commissioner. Yeah. The substantial evidence standard directs the outcome in this case. On each disputed point, the ALJ's analysis of medical opinions of the claimant's allegations in a reworked capacity, the ALJ's findings are reasonable, they're consistent with regulations, and they're consistent with agency policy. First, the ALJ needed only to minimally explain his assessment of the conflicting medical opinions. Regarding Dr. Karim, the connecting thread of the ALJ's reasoning is that Dr. Karim endorsed very extreme limitations, but his treatment notes and other evidence do not corroborate that degree of limitation. Dr. Karim opined that the appellant was markedly limited in nearly every category of mental functioning, included marked and extreme limitations in the agencies for broad functional domains, but his own treatment notes uniformly state the appellant has only mild or moderate limitations in her functional status. Can I tell you, Mr. Buddy, what I'm concerned with here, and you can help me think through it? It's the CPP part of the analysis. Okay? And here, I'll be specific about that. The appellant, I think, unquestionably recognizes that Ms. Moy is pretty substantially limited. I mean, the kinds of, the effects of the mental distress, the mental impairment, is pretty serious. I mean, nobody's arguing that. I mean, the hallucinations, the extreme nature of the hallucinations, all of that. But the ALJ from there is very focused on what she is capable of doing and what she's doing in her, let's just call it kind of private life because she's not working, okay, with her, in other words, with her family within the confines of her own home. But it doesn't seem, at least from my reading of the record, that the extreme mental distress is triggered within the home so much. It's more, you know, seeing people covered in blood, worried that somebody has a knife, going into hiding in a public place, all of those kinds of things seem to happen when she's outside the home. So the question that that raises for me is what gives us confidence that the ALJ rooted in substantial evidence a determination that she's capable of working an eight-hour shift? It's the kind of, can she persist over the course of a standard day? Because the work's not going to be in her home. Well, the first point is that the ALJ didn't reject all of the opinions. The opinions of Drs. Karim, or Drs. Yakin and Fritz, rather, the state agency opinions. They reviewed Dr. Karim's opinions. They reviewed Nurse Avalon's counseling records and the plaintiff's maximum records. What gives you confidence, arguing on behalf of the commissioner, that she can persist over an eight-hour day outside the home? Well, the reviewing psychologist's opinions concluded that the appellant could persist at multiple step instructions for a normal work period with no difficulty concentrating sufficiently for that period. So that's one source of evidence. The other evidence the ALJ pointed out in the decision is that at appointments with her medical providers, the claimant didn't exhibit the types of extreme limitations that she alleged or that Dr. Karim alleged. There's a six-month course of treatment with various providers for physical complaints, including, I believe, a urinary surgery. And not only do none of those providers indicate that she has any observed mental limitations, they actually find she has a normal mood. And I think the point is the disconnect between the extreme limitations that the appellant alleged and Dr. Karim indicated in his opinion, and the lack of cooperation of those extreme limitations and other evidence. For instance, Dr. Karim opines the claimant has a 99% impairment and even simple concentration that she can't leave her house even without having emotional outbursts or seeing other people in public. Yet the records for other treatment providers don't reflect such extreme limitations. So I think ALJ accommodated her somewhat with significant work restrictions, but did not find the record supported the degree of limitation that the claimant opined to. What's your thought about the ALJ's description of her treatment as infrequent and somewhat infrequent and conservative? Well, if you look at Dr. Karim's actual treatment notes, they document, I believe, the first treatments at the end of July. And then there are significant gaps in treatment throughout 2020 until about January 2021, including around the time he offered his opinion in October 2020. There's the ALJ notes at one point in the decision, there's a month-long gap between, I believe it's mid-November and early January. Yeah, but over the course of a year, we've got, I believe, something like 34 psychotherapy sessions with Dr. Karim. He prescribes once a week. It doesn't happen every week, but it's certainly well over every two weeks. And she's getting pretty strong medications and she's still suffering from this. I have trouble that there's some, I guess, this does seem to me to look like some minimization of what the evidence was actually showing. I think what the ALJ is referring to is the initial gaps in treatment around the time of the opinion. Certainly, the court's correct. The treatment gets much more frequent in 2021. But this court has also recognized that therapy and medications, even for mental impairments, is conservative treatment. As compared to what? Electric shock? Well, there could be certainly more invasive hospitalization kind of treatments. That's not certainly required, but I think the ALJ is really referring to the gaps in treatment around the time that Dr. Karim gave this extreme opinion. The plaintiff is telling us that the ALJ was misunderstanding the evidence about activities of daily living, and in particular, these activities outside the home where the evidence, as I understand it, is that she simply was not able to function independently. She needed to be accompanied by her husband or others. What do you think? That's what the claimant alleged, but I think if the ALJ was pointing to the other treatment records where she's interacting with medical providers, and those providers aren't observing such extreme limitations as the claimant alleged, and that's really the disconnect is between the degree of limitation that was alleged and what the record showed. Because a reasonable person might certainly find, as the ALJ did, that if the claimant were experiencing that degree of limitation, certainly that would be noted in the treatment. Was she going to those doctors, the other doctors, the physical doctors, on her own or with someone else? I'm not sure if that's always clear in the record. Usually, I wouldn't think it would be. I know that the appointments with Dr. Karim say that the claimant is going alone. I don't know if that means no one accompanied her to the appointment or just she was in the actual office alone. That's not 100% clear from the record, but what is true is that the providers who are treating her for physical complaints, they actually note that the claimant has no observed abnormalities in mood. They make normal mental findings. They do make some mental findings. And granted, that's treatment for physical complaints, but again, I think the core problem for the ALJ was that the claimant and Dr. Karim allege some really extreme limitations and you would expect that there would be some resort to those. If somebody is suffering debilitating hallucinations two or three hours a day, you might not see that at a doctor's office, but they still couldn't do the work, couldn't work for an eight-hour shift, right? That's certainly possible, but I think the ALJ was looking longitudinally at the records. In particular, there was a six-month period in 2021 where she's receiving a decent amount of medical treatment and there's no notation of any mental issues. There's also primary care records from her provider. She certainly reports some symptoms to her primary care doctor, and I believe there's one appointment where the doctor actually indicates an abnormal mood and mental status findings, but for the most part, the doctor doesn't say much about abnormal mental status findings. Mr. Budde, just real quick, do you know anything in the record that speaks to that question that I asked Mr. Kidd earlier about? I know that she went to the ER because she was having But do we know much about what she was experiencing in the prior periods? I don't believe so. I think that's pretty much the first record of treatment that we have. Okay, all right. Thank you. Yep, thanks to you. Mr. Kidd? I think I just have one quick point to make concerning the six-months treatment, the physical care. My colleague is absolutely correct. Those were for urinary difficulties and a corrective surgery, but during that same six-month time period, she had 20 different psychiatric treatment notes. It just simply doesn't make sense to focus exclusively on the physical notes while excluding the psychological experts. Also, the gap in treatment that was mentioned is a seven-week gap over the course of like a 14-month record. Longitudinally, she is receiving regular psychiatric treatment. Unless there are other questions or concerns, I'll otherwise rest on the merits of my brief in today's argument. Okay, Mr. Kidd, thanks to you. Mr. Budde, thanks to you. We'll take the appeal under advisement. We appreciate it.